## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

Willie Frank Wright, Jr.,

               Plaintiff,

v.                                Case No. 4:22-cv-97-MLB

Warden Kevin Sprayberry, et al.,

               Defendants.

_____/

## OPINION & ORDER

For the reasons explained below, the Court **GRANTS** Defendants'
Motion for Summary Judgment.  (Dkt. 42.)

## I.  Background Facts

In 2020, Plaintiff Willie Frank Wright, Jr. was incarcerated in Hays
State Prison.  (Dkt. 59-1 ¶¶ 1, 2.)  Defendant Kevin Sprayberry was the
Warden, Defendant Reagan Black the Deputy Warden of Security (for
some of that time), and Defendant Gabriel Illa the Unit Manager over
the unit where Plaintiff lived.  (*Id.* ¶¶ 5–8.)

At the time, prison officials relied on a somewhat complex system
for deciding where to house inmates within the prison.  As part of that,

they maintained security profiles for every housing unit and considered that profile in housing assignments. (*Id.* ¶ 23.) Officials considered each inmate's security classification (as requiring minimum, medium, or close security), but that classification was not dispositive. (*Id.* ¶ 22.) Prison officials also considered any known threats against an inmate and an inmate's medical, mental health, educational, or and training needs. (*Id.* ¶¶ 23–24.) Importantly, after considering these factors, prison officials could house an inmate with a medium security designation in a unit with close security classification or with inmates requiring higher classifications. (*Id.* ¶ 25.)[1] It was not uncommon for an inmate to report that his cellmate had threatened him. When that happened, prison

---

[1] Two threshold matters warrant attention. First, Plaintiff misnumbered his responses to Defendants' statement of undisputed facts beginning with fact twenty-seven. (Dkt. 59-1.) This error shifts all subsequent responses up two numbers. Second, the Court uses the parties' proposed facts and responses as follows. When a party does not dispute an asserted fact (or part of a fact), the Court accepts it. When a party denies an asserted fact—as Plaintiff does to this fact—the Court reviews the record. If the denial lacks merit (as many do here) the Court accepts the fact. If an asserted fact is immaterial or a legal conclusion, the Court excludes it. The Court sometimes modifies an asserted fact to accommodate an objection when the record supports it. The Court also draws some facts directly from the record as permitted. *See* Fed. R. Civ. P. 56(c)(3).

officials reevaluated the inmate's housing situation and determined whether reassignment was needed. (*Id.* ¶ 28.) In doing so, officials considered whether the inmate was trying to game the system to receive a more desirable housing arrangement. (*Id.* ¶ 27.) Prison officials exercised considerable discretion when deciding where to house inmates. (*Id.* ¶ 21.)

In May 2020, prison officials reassigned Plaintiff to the administrative segregation unit within Hays prison. (*Id.* ¶ 9; Dkt. 42-4 at 1.) They placed Plaintiff, a medium security inmate, in a cell with Nathaniel Cummings, a close security inmate. (Dkt. 59-1 ¶¶ 3, 10–11.)[2] Plaintiff had never met Cummings before. (*Id.* ¶ 12.) Over more than a decade in custody, Cummings had incurred twenty-three largely non-violent infractions, such as failure to follow instructions. (Dkts. 59-1 ¶ 31; 42-9 at 1.) In 2018, however, prison officials cited Cummings for assault, identified as "non-serious." (Dkt. 59-1 ¶ 31.)

_____

[2] In a document attached to his response to Defendants' motion for summary judgment, Plaintiff attaches a handwritten statement in which he seems to allege prison officials placed him in a cell with Cummings in retaliation for seeking medical treatment. (Dkt. 59-3 at 2.) That allegation is hard to follow and not part of this case.

Neither Sprayberry nor Black were involved in the decision to place Plaintiff in the cell with Cummings. Indeed, neither of those Defendants made any housing decisions relevant to Plaintiff during Plaintiff's incarceration at the prison. (*Id.* ¶¶ 17–18.) Illa could not recall having any involvement in the housing decision. (*Id.* ¶ 19.)

Within two days of becoming cellmates, Cummings gave Plaintiff a mixed drink containing some unknown substance. (Dkts. 59-1 ¶ 13; 42-3 at 43:21–25, 44:3–4; 42-8.) Plaintiff says he woke up with injuries consistent with having suffered a sexual assault and concluded Cummings had drugged and sexually assaulted him. (Dkts. 59-1 ¶ 13; 42-3 at 12:9–11.) Prison medical staff treated Plaintiff following the incident. (Dkt. 59-1 ¶ 31.) Defendants averred they were unaware that any housing practice or policy posed any risk to Plaintiff or any other inmate. (*Id.* ¶ 27.) Nor were they aware that Cummings or any specific inmate posed a threat to Plaintiff. (*Id.* ¶ 27.)

Plaintiff claims he "sent" Illa a Prison Rape Elimination Act ("PREA") complaint on May 15, 2020, but Illa wadded it up, threw it away, and threatened to "put him in a strip cell and put his [genitals] in his mouth to shut him up." (Dkts. 59-2; 59-3; 60-1 at 10 ¶ 1.) Plaintiff

nevertheless filed a PREA complaint two days later. (Dkts. 59-3; 59-1 ¶ 15; 42-8.) The prison's PREA compliance manager investigated Plaintiff's complaint. (Dkt. 42-8.) The investigator's report indicates he spoke with Plaintiff and Cummings, obtained no other evidence to corroborate the allegation, and recommended finding Plaintiff's allegation "unsubstantiated." (*Id.*)

Sometime after that, a prison officer unlocked the steel tray door on Plaintiff's cell. (Dkt. 60-1 ¶ 2.) (Guards apparently use these doors or slots to pass food to inmates or otherwise communicate with them.) Plaintiff thought Illa (who was walking through the unit) could help him get a new housing assignment. (Dkts. 42-3 at 64:10–64; 59-3.) Plaintiff put his hand through the tray opening (presumably to get Illa's attention). (Dkt. 59-1 ¶ 31.) Plaintiff claims he was asking Illa about being moved to another cell, saying he "was like, man, look man, you know . . . you going – you going to get me out." (Dkt. 42-3 at 63:14–18.) Illa told Plaintiff to remove his hand from the tray opening, saying "[g]et back in there, get back in there." (Dkt. 42-3 at 63:20–21.) Illa then slammed the tray flap on Plaintiff's hand. (Dkt. 59-1 ¶ 35.) Medical staff,

at some unknown later time, tended to his injury and concluded Plaintiff had a fractured knuckle. (Dkts. 59-1 ¶ 37; 60-1 at 12 ¶ 6.)

The parties dispute exactly how that happened, particularly whether Illa adequately warned Plaintiff before slamming the tray flap on Plaintiff's hand. Defendants contend Plaintiff admitted at his deposition that Illa "repeatedly instructed Plaintiff to remove his hand from the tray flap and Plaintiff did not comply." (Dkt. 59-1 ¶ 34.) By Defendants' account, Illa only closed the flap when Plaintiff refused to obey repeated instructions, thus justifying the use of force. But that greatly overstates the clarity of Plaintiff's testimony on this issue. When asked what happened, Plaintiff testified:

> I was telling Eliu [sic], I was, like, Man – man, what you going to do, man . . . my buddy back here, man, like, you going – going to get me out. [Illa] slammed it. Bam. He slammed it down right on my hands and like, Get back in there. Get back in there. See, he was telling me to get back in the – you know, put my hand back in the cell, this, that and the third. Well, he didn't like my hands out the cell.

(Dkt. 42-3 at 63:14–24.) True, Plaintiff admitted Illa said "get back in there" and that he told Plaintiff to put his hand back in the cell. But, without some transitional signposts showing a sequence of events or the passage of time, Plaintiff's testimony does not establish the chronological

clarity Defendants insist.  Most importantly, Plaintiff did not say "he told me to move my hands and **_after that_** slammed the door."  In the absence of an established sequence, a jury could conclude Illa gave the warning "get back in there" simultaneous with his actions.  Defendants had the opportunity at the deposition to break this testimony down if they wanted to do so.  They did not and thus are left with a fairly muddled telling of the events.

Plaintiff submitted an affidavit in opposition to Defendants' motion for summary judgment with a much clearer set of facts.  (Dkt. 59-2.) Plaintiff averred that Illa "Never gave [him] a 'Direct Order' to Remove [his] hands out the Flap," that "it was all of a Sudden action," and that Illa "never gave [him] a Fair warning that [he] was in Danger of being Assaulted" if he did not move his hands.  (*Id.*)  The parties dispute these facts.

## II.    Procedural Background

On April 22, 2022, Plaintiff sued Defendants under 42 U.S.C. § 1983.  (Dkt. 1 ¶¶ 18–19.)  He alleges Sprayberry and Black violated his Eighth Amendment rights by "exhibiting deliberate indifference" to their "duty to protect Plaintiff from serious physical injury and sexual attacks

by other inmates" and by "refus[ing] to transfer him to a safer" cell. (*Id.* ¶¶ 16–17.) He repeats this allegation against Illa and alleges Illa violated his Eighth Amendment rights by "delay[ing] the rape kit" and by "slamming [the tray] flap" on his hands. (*Id.* ¶ 19.) Finally, he claims Illa violated his First Amendment rights by "reject[ing his] PREA investigation." (*Id.*)

Defendants move for summary judgment. (Dkt. 42.) Plaintiff responds with his own affidavit, his sworn PREA complaint, and a Response to Defendants' Statement of Material Facts. (Dkts. 56–59-1.) Plaintiff's brief consists of three pages summarizing the facts relevant to the Eighth Amendment claims, one-and-a-half pages outlining the summary judgment standard, and two sentences of argument. (Dkt. 59.) Indeed, his entire argument consists of the following: "Plaintiff's own sworn testimony will prevent the entry of judgment prior to trial, so long as the evidentiary tests of the Supreme Court and the Eleventh Circuit are met. In the words of *Matsushita*, more is required than 'metaphysical doubt as to the material facts.'" (*Id.* at 5.)

The absence of evidence does a lot of work in this case. Plaintiff's years-long neglect of his case resulted in him producing almost no

evidence for any claim. For context, the Court twice extended the discovery deadline. (Dkts. 19, 22.) Over a year later, the Court reopened discovery after Defendants showed good cause due to persistent communication and scheduling difficulties with Plaintiff's counsel. (Dkt. 36.) Defendants finally deposed Plaintiff on May 29, 2024, and the reopened discovery period ended on May 31, 2024. (Dkts. 42-3, 36.) Then, after Defendants moved for summary judgment, the Court extended Plaintiff's response period several times. (Dkts. 44, 53.) The Court gave Plaintiff more than three times the standard response time. LR 7.1((B), NDGa. Rather than respond, however, Plaintiff—a week before the response deadline and almost two years after discovery began—sought to depose Defendants. (Dkt. 54.) The Court denied that request, explaining its reasons in detail. (Dkt. 55.)

## III. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine

dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The non-moving party then has the burden of showing summary judgment is improper by coming forward with "specific facts" demonstrating a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Non-movants may create a genuine issue of material fact by their own non-conclusory affidavit. *United States v. Stein*, 881 F.3d 853, 858–59 (11th Cir. 2018) ("A non-conclusory affidavit which complies with Rule 56 can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated."). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021).

## IV. Discussion

"In order for a plaintiff to establish a claim under [] § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." *Martinez v. Burns*, 459 F. App'x 849, 850–51 (11th Cir. 2012) (citing

*Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)).[3]  And for each claim, the plaintiff must prove "an affirmative causal connection between the official's acts or omissions and the alleged constitutional violation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).  Defendants do not dispute they always acted under color of state law, but Defendants Sprayberry and Black say they are entitled to summary judgment because no evidence suggests they did anything to cause the alleged sexual assault.  (Dkt. 42-1 at 9-10.)  Illa makes the same argument and also argues he is entitled to summary judgment because he did not violate Plaintiff's constitutional rights in responding to the PREA complaint, slamming the tray door, or doing anything else.  (*Id.* at 11-18.) All three Defendants claim they are entitled to qualified immunity.  (*Id.* at 18-20.)

---

[3] The Court recognizes *Martinez* is unpublished and not binding.  The Court cites it and other cases nevertheless as instructive.  *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

### A.    Eighth Amendment Claim Against Sprayberry and Black Arising From the Alleged Sexual Assault

Sprayberry and Black—the Warden and Deputy Warden—were Illa's supervisors.  It is well established in the Eleventh Circuit that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "Instead, to hold a supervisor liable[,] a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."  *Keith v. Dekalb Cnty.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("Absent vicarious liability, each Government official, *his or her title notwithstanding*, is liable *only* for his or her own misconduct.").  This standard is "extremely rigorous."  *Keith,* 749 at 1047-48.

No evidence suggests Sprayberry or Black were personally involved in any of the alleged conduct about which Plaintiff complains.  They, for instance, unequivocally said in their affidavits that they played no role in Plaintiff's housing assignment or reassignment.  (Dkts. 42-5 ¶¶ 4, 12–13; 42-6 ¶ 5.)  Plaintiff offers no evidence to dispute that but simply

argues Sprayberry oversaw the prison and Black oversaw security. (Dkt. 59-1 ¶¶ 18, 19.)  That is simply an argument for vicarious liability.  It presents no evidence to raise a material fact of Sprayberry's or Black's involvement in the housing decision.  While unclear whether Plaintiff claims Sprayberry and Black are liable for the other constitutional violations he claims against Illa, the Court (in an abundance of caution) concludes no evidence suggests they were involved in those events. Specifically, no evidence suggests Sprayberry and Black had any knowledge of—much less participated in—Plaintiff's PREA complaint process, Illa's slamming the tray door, administering the rape kit, or investigating the PREA complaint.  Indeed, as Defendants aptly note, Black had transferred to a different prison before the incident. (Dkt. 42-1 at 11.)  Plaintiff tacitly concedes as much in his statement of undisputed material facts (discussing mostly Illa's actions) and his affidavit (discussing only Illa's actions).  (*See* Dkts. 59-1; 59-3.).  So Plaintiff has produced no evidence from which a jury could conclude Sprayberry or Black were personally involved in any of the conduct about which Plaintiff complains.

What's more, no evidence supports any causal connection between their actions and the alleged constitutional violations to establish supervisory liability.    The evidence does not show any history of widespread inmate-on-inmate sexual assaults or other relevant misconduct that could have put these Defendants on notice that Cummings might assault Plaintiff.  *Keith*, 749 F.3d at 1048.  Nor does Plaintiff show they "had a 'custom or policy'" that furthered Plaintiff's purported victimization.  *Cottone*, 326 F.3d at 1360.  Finally, no evidence indicates Sprayberry or Black "directed the subordinates to act unlawfully or knew[, but failed to stop,]" subordinates' unlawful behavior.  *Id.*

Plaintiff seeks to hold these two Defendants responsible for others' actions because of their supervisory position.  That proposition runs afoul of clear precedent.  The Court, therefore, grants summary judgment for Sprayberry and Black as to all Plaintiff's claims.

## B.    Eighth Amendment Claim Against Illa Arising from the Alleged Sexual Assault

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "It is not, however, every injury

suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Harrison v. Culver*, 746 F.3d 1288, 1298 (11th Cir. 2014). Rather, "[o]nly [a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.*

The Court believes Plaintiff asserts an Eighth Amendment claim against Illa for having housed him with Cummings, who he says was an "especially dangerous" inmate who sexually assaulted him. (Dkt. 1 at ¶ 9.) To survive summary judgment on this deliberate indifference failure-to-protect claim, Plaintiff must present evidence to create a genuine issue of material fact showing (1) he faced a substantial risk of serious harm from Cummings, (2) Illa was deliberately indifferent to that risk, and (3) Illa's indifference caused his injury. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). To demonstrate this first element—an objective determination—Plaintiff must "provide evidence that there was a strong likelihood" Cummings would assault him. *Rhiner v. Sec'y, Fla. Dep't of Corr.*, 817 F. App'x 769, 775 (11th Cir. 2020). The mere "occurrence of the prisoner's injury alone is not enough,

on its own, to show after the fact a substantial risk of serious harm." *Id.* On the second element—a subjective determination—Plaintiff must present evidence to raise a genuine issue of material fact showing that Illa (1) was subjectively aware Cummings posed a risk to Plaintiff, (2) disregarded that risk in housing Plaintiff with Cummings, and (3) acted with more than gross negligence. *Id.*

Illa is entitled to summary judgment on this claim for several reasons. To begin, Plaintiff fails to raise an issue of material fact as to causation. No evidence suggests Illa made the decision to house Plaintiff with Cummings. Illa presented an affidavit saying he could not recall whether he made any decision about Plaintiff's housing, but (if he did) he did it with an eye towards inmate safety. (Dkts. 42-7 ¶ 3; 59-1 ¶ 19.) This is not evidence he had anything to do with the decision. Illa cannot deny doing so but the absence of a denial is not—at least here—affirmative evidence of anything. After all, a jury could not reasonably infer that he made the decision simply because he could not specifically deny doing so. Yet Plaintiff offers no affirmative evidence to suggest Illa's involvement. He obtained no records from the prison or anything like that. Instead, he merely alleges (in response to Defendants' Statement of Undisputed

Material Facts) that Illa was responsible for the housing and security of prisoners. (Dkt. 59-1 ¶ 19.) But he cites no evidence for this conclusory assertion. He presents no evidence of Illa's responsibility for housing, let alone evidence that responsibility meant he made the specific decision at issue here. Without this evidence, Plaintiff cannot raise an issue of material fact to show that anything Illa did led to his alleged injury.

Digging deeper, Plaintiff also fails to present any evidence he faced a substantial risk or strong likelihood of injury from being housed with Cummings. Illa presents evidence that Cummings had 23 disciplinary reports, but "almost all were for nonviolent infractions such as failure to follow instructions or possession of contraband or cellphones," and only one in 2018 was for "assault (non-serious)." (Dkt. 59-1 ¶ 29.) As a result, all three Defendants averred that Cummings "was not a perfect inmate but he also was not an inmate that [any of them] would have hesitated to house with a medium security inmate, including Plaintiff." (*Id.* at ¶ 30.) Plaintiff offers no evidence to dispute this. He offers no evidence Cummings assaulted anyone else, that he threatened anyone else, or that he exhibited any behavior suggesting he might assault anyone. Nothing. That Cummings allegedly attacked him is not enough. Plaintiff does not

meet his burden of presenting some evidence from which a jury could conclude Cummings posed a risk to him, let alone a substantial risk, at the time someone made the housing decision.

And finally, Plaintiff presents no evidence Illa acted with deliberate indifference to any known risk. Illa presents evidence that neither he, Sprayberry, nor Black were aware that any housing practices at the prison posed a risk to Plaintiff's health or safety. (Dkts. 59-1 ¶¶ 27–28; 42-5 ¶¶ 12–13; 42-7 ¶ 12; 42-6 ¶¶ 12–13.) Plaintiff disputes this by baldly asserting Defendants were "deliberate[ly] indifferent to the security of Plaintiff when they continually housed him in the same cell with a sexually dangerous inmate after receiving his P[R]EA Complaints." (Dkt. 59-1 ¶¶ 25, 28.) He repeats this allegation with slightly different phrasing to "dispute" other facts Defendants produced. (*Id.* ¶¶ 26 ("Defendants were deliberately indifferent to security of the Plaintiff by continuing to house him with a sexually close security dangerous inmate after recdiving [sic] his PREA Complaints"); 27 ("Defendants were deliberately indifferent to the security of the Plaintiff when they continually housed him in the same cell with a sexually dangerous inmate.").) These assertions refer to the prison's decision to ***continue***

housing Plaintiff with Cummings for some time *after* the initial assault and Plaintiff's resulting complaint.  That's not what this case is about as Plaintiff never alleges Cummings attacked him again.  So the Court ignores those conclusory statements.

The Court grants Illa's motion for summary judgment on Plaintiff's Eighth Amendment claim arising from the alleged assault.

### C.    Eighth Amendment Claim against Illa Arising from Allegedly Delayed Rape Kit

Illa also contends summary judgment is proper on Plaintiff's delayed rape kit deliberate indifference claim.  (Dkt. 42-1 at 11–12.) Though difficult to follow, Illa essentially claims Plaintiff's supposed deprivation (the delayed examination for the rape kit) bears no causal connection to his actions because the Eighth Amendment claim extends only to receiving medical attention after an assault.  (Dkt. 42-1 at 10–11.) The Court grants summary judgment for a related reason.

Again, a section 1983 plaintiff must prove "an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation."  *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).  Here, the evidence does not connect Illa to any decisions about when and how to administer the examination

for the rape kit.  Nor does the evidence suggest Illa's meddling in the medical professional's examination or the PREA compliance manager's investigation.  Medical professionals treated Plaintiff's injuries and evaluated whether a rape-kit was needed.  (Dkt. 42-8.)

Without any evidence suggesting Illa's involvement in the decision or dissuasion of more care, Plaintiff fails to establish Illa's responsibility for any constitutional deprivation.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question [of] whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. . . . At most it is medical malpractice[.]"); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").  Illa is entitled to summary judgment on this claim.

## D.   Eighth Amendment Claim Against Illa for Alleged Excessive Use of Force

The Eighth Amendment's proscription "against cruel and unusual punishment is triggered when a prisoner is subjected to a 'unnecessary and wanton infliction of pain.'"  *Bennett v. Parker*, 898 F.2d 1530, 1532

(11th Cir. 1990) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "In considering an Eighth Amendment excessive force claim, [courts] must consider both a subjective and objective component: (1) whether the officials act[ed] with a sufficiently culpable state of mind, and (2) if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Johnson v. Moody*, 206 F. App'x 880, 883 (11th Cir. 2006) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The claim's touchstone, however, is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Force inflicted within the latter category violates the Eighth Amendment. *Haynes v. Volpelletto*, 2024 WL 1911200, at *6 (11th Cir. May 1, 2024) ("In [the custodial] setting, force is deemed legitimate, as opposed to excessive, if it is 'applied in a good-faith effort to maintain or restore discipline.'"). Courts examine five factors to determine at which end of the spectrum the use of force falls:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

*Williams v. Radford*, 64 F.4th 1185, 1196–97 (11th Cir. 2023). A healthy dose of "deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of disturbance," colors this analysis. *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007); *Williams v. Slack*, 438 F. App'x 848, 850 (11th Cir. 2011). "From consideration of such factors, 'inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Skrtich v. Thornton*, 280 F.3d 1295, 1300–01 (11th Cir. 2002). "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . , the case should not go to the jury." *Whitley*, 475 U.S. at 322.

Unlike the other claims, this is a much closer call. Illa argues Plaintiff cannot prove his excessive force claim because each factor demonstrates he justifiably applied force. (Dkt. 42-1 at 13.) The Court disagrees. The first factor—the injury's extent—cuts in Plaintiff's favor. He avers that he suffered a broken knuckle, and Illa does not dispute

22

that.  (Dkt. 60-1 ¶ 6.)  The second factor—the need for force—also skews in Plaintiff's favor, at least on the current record.  Illa claims he was justified in using force because allowing prisoners to leave tray flaps open poses a risk to guards.  (Dkt. 42-1 at 15.)  As part of this, he cites cases in which courts have recognized that inmates can grab guards or throw things at guards if they are allowed to leave their tray slots open.  (*Id.*) But most of these so-called "bucking the flap" cases involve an inmate's stubborn disregard of an officer's clear order to remove his hands from the flap.  *See, e.g.*, *Lester v. Ga. Dep't of Corr.*, 2016 WL 146514, at *4 (S.D. Ga. Jan. 12, 2016) (finding a need for force to "eliminate a threat" to the officers and fellow inmates' safety in response to inmate's "disorderly and subversive actions" of throwing feces through the open flap that caused "commotion" in the unit, attempting to deceive officers by making the unsecured flap appear secured, and trying to snatch an nearby officer's mace); *Brockington v. Stanco*, 2016 WL 4443204, at *9 (M.D. Ga. May 25, 2016) (finding use of force "necessary due to [inmate's] refusals to comply with [officer's] orders" to "put his arm back in the cell" where inmate waived his arm through flap to catch officer's attention); *cf. Rodriguez v. Powell*, 2019 WL 2479301, at *8 (M.D. Ga. Jan. 31, 2019)

23

(rejecting the need for force despite a prison rule violation and supposed warning where officer slammed the tray door on inmate's extended hand without "meaningful instructions or warnings" before applying force).  In cases of that type, the inmate's noncompliance with orders justifies (at least some) force.  *See Orange v. Prescott*, 2024 WL 1156573, at *5 (11th Cir. Mar. 18, 2024) (identifying the purported need "to enforce compliance with [officers'] directives").

The same cannot be said here.  Viewed favorably to Plaintiff, the record shows an officer opened the flap to allow Plaintiff to speak with Illa.  (Dkt. 60-1 ¶ 2.)  And Plaintiff testified he was speaking to Illa and trying to get Illa's attention by extending his hand through the flap.  (Dkt. 42-3 at 63:14–24.)  Even if Plaintiff's actions violated a prison safety rule, like Illa argues, Plaintiff was doing so while trying to communicate with the guard.  And, as already explained, there is a dispute as to whether Illa gave Plaintiff a warning to "get back in there" before slamming the tray door or whether he issued the command at the same time he slammed the door.  By Plaintiff's account in his affidavit and deposition, a jury could find the episode occurred in a flash, undermining any suggestion Illa gave Plaintiff time to comply before hurting his hand.

24

(Dkt. 42-3 at 63:14–24.)  That course of events would undermine Illa's claim that the use of force was necessary.  *See, e.g.*, *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (acknowledging the need for discipline and obedience in prison context but rejecting arbitrary force and the "punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns").

With that jury triable issue in mind, the third factor—the nexus between the need for force and the extent of the injury—also favors Plaintiff.  If Plaintiff was merely seeking to communicate and at least some officers knew this, the amount of force Illa used likely exceeded any legitimate need.  The dispute about whether Illa gave any meaningful warning also weighs against Illa in consideration of the fourth and fifth factors.  Accepting Plaintiff's affidavit, Illa made no efforts to temper the extent of his response at the time.  Admittedly, the fact prison officials provided medical care shows some effort to temper the severity of force after the fact.  *Cf. Cockrell*, 510 F.3d at 1312 (noting officer's immediate request for medical attention after using force tempered the effects of force).  But—because Illa was never deposed—no evidence shows Illa ever considered non-force options, like warning and waiting for a clear

suggestion of noncompliance, guiding Plaintiff's hands back into the cell, or closing the flap slowly enough that Plaintiff could have moved his hand.

Granted, "prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. [And] [c]ertainly they are not required to do so where an inmate repeatedly fails to follow those orders." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008).  But the record contains no evidence that Illa perceived a threat, gave any warning to Plaintiff before slamming the door, or thought Plaintiff posed a security risk at the time he allegedly shut the tray door.  Defendants have decided not to engage, in any way, as to Illa's subjective beliefs at the time.  In the absence of such evidence, a jury could conclude another prison guard opened the flap so Plaintiff could speak with Illa, that Illa knew Plaintiff wanted to speak with him, that Illa had no reason to believe Plaintiff was using the open flap for any other reason, and that Illa slammed the flap on Plaintiff's hand with no warning whatsoever.

Genuine issues of material fact thus preclude summary judgment on this claim.

### E.    First Amendment Claim Against Illa for PREA Complaint

Inmates enjoy limited First Amendment rights. *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008) ("It is well established that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). "Like others, prisoners have the constitutional right to petition the Government for redress of their grievances[.]" *Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Indeed, an inmate's complaint to prison officials about prison conditions strikes at the First Amendment's core. *See Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) ("It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement."). "Prison officials violate a prisoner's First Amendment rights to free speech and to petition the government by punishing that prisoner for filing a grievance concerning

the conditions of his imprisonment." *Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023).

Illa says he is entitled to summary judgment because no evidence suggests he abridged Plaintiff's First Amendment rights since Plaintiff admits he filed a complaint about prison conditions. (Dkt. 42-1 at 12.) Prison officials, according to him, also took the additional steps of investigating the matter initially and referring it to another division for further investigation, so no violation occurred. (*Id.*) The Court agrees.

In his complaint, Plaintiff alleged that, when he reported the alleged sexual assault to Illa, Illa told him to "shut up." (Dkt. 1 ¶ 11.) He further alleged that—three days after the assault—he was moved to another cell, that Illa balled up his PREA complaint and refused to call PREA, and thus "an investigation by PREA was never conducted." (Dkt. 1 ¶¶ 12-13 ("an investigation was never conducted").) Defendant presented undisputed evidence at summary judgment that Plaintiff filed a PREA complaint and the prison conducted the necessary investigation. (Dkt. 59-1 ¶¶ 15, 16.) Plaintiff offers no evidence to dispute that. Instead, he now alleges Illa made the derogatory comments while throwing away his first complaint. (Dkt. 59-2 at 1.) Plaintiff's new

28

allegations, however, do not dispute Defendants' evidence that Plaintiff successfully submitted his grievance so summary judgment on that claim is appropriate.   And the Court does not consider Plaintiff's new allegations against Illa as raising a claim of retaliation because (1) he does not actually argue that at summary judgment and (2) he cannot allege a new theory at summary judgment without amending his complaint. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (disallowing new claims raised through summary judgment briefs when the complaint does not contain that theory).

## F.    Qualified Immunity for All Defendants

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."   *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018).   An official asserting this defense must show that he or she "engaged in a discretionary function when he [or she] performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).   The burden then "shifts to the plaintiff to show that the defendant

is *not* entitled to qualified immunity." *Id.* at 1296.  This requires Plaintiff to show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  *Id.* Critically, "[t]his burden is not easily discharged: That qualified immunity protects government actors is the usual rule." *Jones v. Ward*, 514 F. App'x 843, 846–47 (11th Cir. 2013).

As an alternative argument, all three Defendants argue that—to the extent they were involved in any of the conduct about which Plaintiff complains—they were "engaging in their work duties" at the prison and exercising considerable discretion. (Dkt. 42-1 at 18.) Beyond Defendants' skeletal argument on this point, there is a strong basis to find that—if they did what Plaintiff alleges—they acted within the scope of their discretionary authority.  To the extent any Defendant was involved in deciding where to house Plaintiff, for example, that Defendant was exercising considerable discretion. *Days v. Crickmar*, 2017 WL 4084058, at *2 (N.D. Ga. Jan. 24, 2017) ("[S]electing an inmate's housing assignment is an action within the discretionary authority of prison officials."); *Smith v. Dewberry*, 2023 WL 6620375, at *2 (N.D. Ga. Mar. 27, 2023) ("[A]ssessing threats reported by inmates is an action within

the discretionary authority of prison officials.").  The same is true for Illa's actions in slamming the tray door while patrolling the housing unit and in receiving and responding to PREA complaints.  *Smart v. England*, 93 F.4th 1283, 1288 (11th Cir. 2024) ("We have repeatedly explained that the administration of discipline is a job-function defined at the appropriate level of generality for the analysis of a public official's discretionary authority."); *Mitchell v. Gibbs*, 2007 WL 2819515, at *3 (M.D. Ga. Sept. 25, 2007) (describing a prison official's "supervising inmates" authority).

The Court agrees Defendants have done enough, so the burden shifts to Plaintiff to defeat qualified immunity.  *Hicks v. Ferrero*, 241 F. App'x 595, 597 (11th Cir. 2007) ("[W]here, as here, it is undisputed that government officials were acting within their discretionary authority, the burden is on the plaintiff to demonstrate that qualified immunity is not appropriate."); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer . . . has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.").

Plaintiff makes no argument in response to Defendants' claim they are entitled to qualified immunity.  The Court construes Plaintiff's failure

to respond as an abandonment of the issue and concludes he has failed to meet his burden of persuasion. *See Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) (granting summary judgment when plaintiff never "attempted" to respond to defendant's arguments); *Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1139 (N.D. Ga. 2007) (granting summary judgment on plaintiff's state-law claims where plaintiff never responded to those arguments); *Borjas v. Fulton Cnty.*, 2009 WL 10698659, at *2 (N.D. Ga. Dec. 11, 2009) (granting defendant's motion for summary judgment where plaintiff never addressed any opposing arguments and cited no evidence); *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles [d]efendant to summary judgment on these claims.").

Defendants nicely frame the point: "the only caselaw [Plaintiff] cites is generic law about the summary judgment standard. He does not

address the applicable substantive law at all." (Dkt. 60 at 5.) They are right. By submitting a statement of material facts and two conclusory sentences of argument addressing the merits but not qualified immunity, Plaintiff indicates that he chose to oppose other portions of Defendants' motion but not this issue. Perhaps someone could view this conclusion unfounded since he certainly wants to maintain his claims. Maybe he determined he has no persuasive response? But holding otherwise would send the Court on a wild goose chase "to distill every potential argument [for qualified immunity] that could be made based upon the materials before it on summary judgment." *Edmondson v. Bd. of Trs. of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007). That's Plaintiff's job. *Edmondson*, 258 F. App'x at 253 (citation omitted) ("[T]he onus is upon [Plaintiff] to formulate arguments.").

Requiring the Court to ignore Plaintiff's silence and oppose Defendants' arguments itself would also needlessly burden the Court, forcing it to imagine and analyze all possible arguments that might permit Plaintiff to maintain his claims. *Hewlett-Packard Co. v. CP Transp. LLC*, 2012 WL 4795766, at *2 (S.D. Fla. Oct. 9, 2012) ("When parties do not fully develop their arguments and support them with

citation to legal authority, the burden upon the Court is improperly increased."). Without the abandonment doctrine, Plaintiff's intentional decision also fosters unfairness for Defendants, who have done their part to test Plaintiff's allegations through the summary judgment process. There is another fundamental fairness issue here. Plaintiff chose to bring this case. He seeks to drag Defendants into court, impose liability on them, and collect money from them. He should be held to the task he chose for himself. He should not be permitted to shirk his responsibility with the hope the Court—a neutral—will do his work for him and keep Defendants in court against their will. Finally, this result is not unfair to Plaintiff since he had fair warning of Defendants' qualified immunity argument and plenty of time to oppose it.

All Defendants are entitled to qualified immunity on all Plaintiff's claims.

## V.    Conclusion

The Court **GRANTS** Defendants' Motion for Summary Judgment. (Dkt. 42.)

**SO ORDERED** this 14th day of March, 2025.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE